IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION

FILED
U.S. DISTRICT COURT

|  |  |
|---|---|
| SHARON SELLS,<br><br>Plaintiff,<br><br>vs.<br><br>THE PHILLIPS PETROLEUM COMPANY,<br>and METROPOLITAN LIFE INSURANCE<br>COMPANY,<br><br>Defendants. | 2006 FEB 23  A 11: 03<br><br>DISTRICT OF UTAH<br><br>BY:_____<br>**ORDER AND OPINION** CLERK<br><br>Case No. 2:03-CV-1111<br><br>Judge Dee Benson |

## I. INTRODUCTION

Plaintiff Sharon Sells seeks recovery of long-term disability benefits under the group disability benefits plan of her former employer, Defendant Phillips Petroleum Company ("Phillips"). Ms. Sells argues that Defendant Metropolitan Life Insurance Company ("Metlife"), which insures and administers the Phillips disability plan, violated the Employment Retirement Income Security Act ("ERISA") by improperly terminating her disability payments. Ms. Sells requests that Metlife or, in the alternative, Phillips be ordered to pay her long-term disability benefits due from the time of the termination of her benefits to the present and to make continuing payments in the future. Metlife moves for judgment on the administrative record, arguing that based upon the evidence in the administrative record Metlife reasonably decided to terminate the payment of long-term disability payments to Ms. Sells because she failed provide proof of her continuing disability.

## II. BACKGROUND

Ms. Sells began working for Phillips on May 26, 1981. On June 3, 1986, Ms. Sells was involved in an automobile accident when another automobile crashed into the rear of her car while she was stopped at a railroad crossing. Ms. Sells suffered a soft tissue whiplash injury. In

the days following the accident, Ms. Sells' pain increased, rather than decreased. Ms. Sells began experiencing symptoms that were not fully explained by her whiplash injury. She complained of sore muscles, stiffness in her chest muscles, which restricted her breathing, numbness in her hands, face, and mouth, pins and needles sensations in her shoulders, arms, and legs, dizziness, cranial pressure, headaches, including migraines with nausea and vomiting, heart palpitations, sleep difficulties, memory loss, concentration difficulties, chronic fatigue, and neurocognitive difficulties, including forgetting or transposing words when speaking. In October 1986, Ms. Sells was diagnosed with fibromyalgia. Ms. Sells was also later diagnosed with asthma, sleep apnea, acid reflux, migraine headaches, tension headaches, and irritable bowel syndrome.

After her car accident, Ms. Sells returned to work at Phillips, where she had been working full time as a Traffic/Lab clerk. Phillips, however, deemed Ms. Sells disabled and incapable of performing her duties. Philllips, therefore, terminated her employment. Ms. Sells last worked on October 18, 1986.

As a full-time employee at Phillips, Ms. Sells was a participant in the company's group long-term disability benefits plan ("Phillips Plan"). In July 1987, General American Life Insurance Company ("General American"), the insurer and claim administrator of the Phillips Plan, approved Ms. Sells' claim for long-term disability benefits. Ms. Sells' disability benefits had an effective date of April 15, 1987.

The Phillips Plan, which is governed by ERISA, provides that a claimant's disability benefits will terminate on "the date the Employee ceases to be totally disabled." The Phillips Plan provides than an employee who is under the care of a licensed physician will be eligible for benefits in accordance with the following:

2

> (A) During the Qualifying Period and the first 24 months during which the Employee is eligible for benefits, he will be considered totally disabled if due to injury, sickness, or pregnancy, he is unable to work at his regular job or at a reasonable occupation which is available with the Employer.
> (B) Thereafter the Employee will be deemed totally disabled if, due to injury, sickness, or pregnancy, he is unable to work at any gainful occupation for which he is or may become fitted.

The Phillips Plan requires a participant receiving benefits to "furnish due proof of the continuance of total disability as required by the [Insurance] Company." The employee receiving benefits must submit "[a]ffirmative proof" of disability "at such intervals as may be required by the Insurance Company during the continuance of total disability."

Ms. Sells continued to submit affirmative proof of her disability and continued to receive long-term disability benefits under the Phillips Plan from April 1987 until May 14, 2001, when Metlife, the new insurer and administrator of the Phillips Plan, decided to terminate her benefits, which were $797 per month.

In August 2000, the administration of the Phillips Plan was transferred from General American to Metlife. On August 4, 2000, Metlife's claim manager reviewed Ms. Sells' file and determined that Metlife needed to reevaluate her disability claim. By a letter dated the same day, Metlife informed Ms. Sells that it needed to update her claim file and asked her to have her treating physician complete and return an Attending Physician's Statement by August 31, 2000.

On August 12, 2000, Ms. Sells' long-time physician, Dr. Deborah Robinson, a doctor of internal medicine and a specialist in fibromyalgia, completed an Attending Physician's Statement for Metlife. Dr. Robinson noted Ms. Sells' subjective complaints and confirmed her diagnosis of fibromyalgia and myofascial pain.

From December 18-20, 2000, International Claim Specialists surveiled Ms. Sells for Metlife. On the first two days of surveillance, Ms. Sells was merely observed operating a motor vehicle. On the third day, Ms. Sells was not observed at all.

Metlife referred Ms. Sells' file to Crawford Healthcare Management Services and hired that company to assess the level of Ms. Sells' "functioning abilities and capabilities as well as her ability to understand instructions." On January 8, 2001, Crawford Healthcare sent a non-physician employee, Mr. Byron Hall, to meet with Ms. Sells in her home to perform a vocational evaluation. Ms. Sells explained her symptoms to Mr. Hall and told him she did not believe she is able to return to work. After meeting with her for two hours, Mr. Hall noted his observations of Ms. Sells and identified ten vocational alternatives that he believed were available to her based on her education, work experience, and limitations.

In February 2001, a Metlife nurse consultant prepared a summary of Ms. Sells' medical records and the findings of Mr. Hall's home visit. The nurse consultant determined that Ms. Sells' level of impairment needed clarification and referred Ms. Sells' file to Dr. Amy Hopkins, an independent physician consultant, for her review. Dr. Hopkins, who is board certified in internal and occupational medicine, determined that there was no objective documentation that Ms. Sells had any physical impairments and that Ms. Sells should be able to return to work full time without any restrictions and limitations.

In March 2001, Metlife's nurse consultant summarized Dr. Hopkins' findings and concurred with Dr. Hopkins' conclusion that Ms. Sells was not totally disabled. The nurse consultant then forwarded Dr. Hopkins' report to Ms. Sells' physician, Dr. Robinson. Dr. Robinson disagreed with Dr. Hopkins' evaluation. Dr. Robinson said that "it is unlikely that [Ms. Sells] can return to a productive full-time position, and her part-time positions need to be

4

carefully evaluated for her to maintain an employer acceptable work productivity." She also stated that her "suspicion" was that any attempt by Ms. Sells to return to work would be unsuccessful.

In her letter to Metlife, Dr. Robinson also referenced Ms. Sells' ongoing physical therapy, of which Metlife had been unaware. Metlife obtained materials from Ms. Sells' physical therapist, Steve Shupe, a specialist in treating myofascial pain and fibromyalgia, and asked Dr. Hopkins to review that material along with Dr. Robinson's reply to her original evaluation of Ms. Sells' file. On May 3, 2001, Dr. Hopkins stated that the physical therapist's notes "documented some myofacial dysfunction, but no specific impairments were listed." She also noted that Dr. Robinson's response "reiterated Sells' subjective complaints, but did not document any objective findings." Dr. Hopkins concluded that "[n]o physical impairments were documented" in Ms. Sells' file which would preclude her from full-time work in any occupation.

On May 14, 2001 Metflife decided to terminate Ms. Sells' benefits. Among its reasons for terminating Ms. Sells' benefits, Metlife stated that "there is no neuropsychological testing to document complaints of cognitive impairment and no sleep history to document complaints of extreme fatigue." Metlife concluded that "there is no medical documentation or clinical data presented which shows [Ms. Sells'] condition to be severe enough that it would prevent [her] from performing returning [sic] to work on a full time basis."

In June 2001, Ms. Sells notified Metlife by letter that she was appealing the termination of her benefits. She also hired Claims Management, Inc. as her claim representative. In connection with her appeal, Ms. Sells submitted a report regarding her sleep disorder and a neuropsychological report. The sleep report, written by Dr. Tom Cloward, concluded that Ms. Sells has "very serious sleep disordered breathing," but the primary cause of her sleep disorder is

related to her use of pain medications. The neuropsychological evaluation, conducted by Dr. Janiece Pompa, indicated that given Ms. Sells' weaknesses, she "would probably need to work in a setting where she is not required to work quickly, and does not need to make independent decisions or use higher-order reasoning skills." Dr. Pompa concluded that "[o]f course" Ms. Sells' "capacity for competitive employment would be mitigated by her chronic pain and physical problems, as documented by her physician."

Metlife submitted Ms. Sells' file to a new independent physician consultant, Dr. Joseph Nesta, for his review. Overall, Dr. Nesta agreed with Dr. Hopkins' assessment that Ms. Sells is not totally disabled.

Metlife's doctors never met with or examined Ms. Sells.

In March 2002, Metlife informed Ms. Sells of its decision to uphold the termination of her benefits. Metlife acknowledged that it was not disputing "the existence of a diagnosis or that [Ms. Sells] may experience pain or discomfort with [her] condition." Metlife, however, stated that "clinical evidence must be furnished to substantiate symptoms consistent with those reported by the patient and medical providers." Metlife also informed Ms. Sells that its decision was final and constituted a completion of its review.

In January 2003, Claims Management requested that Ms. Sells' file be reopened, but Metlife responded that Ms. Sells' case remained closed. Ms. Sells claims that she continues to be totally disabled and cannot engage in any gainful occupation because of her condition.

The issue before the Court is whether Ms. Sells complied with her contractual obligation under the Phillips Plan to "furnish due proof of the continuance of [her] total disability," justifying her continued entitlement to long-term disability benefits. Both sides agree that a *de novo* standard of review applies in this case. A denial of benefits challenged under ERISA "is to

6

be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Hall v. UNUM Life Ins. Co., 300 F.3d 1197, 1200 (10th Cir. 2002). Both sides agree that the Phillips Plan does not contain an express grant of discretionary authority making the matter reviewable under an abuse of discretion standard. See id. at 1200-01.

Under a *de novo* review, the Court accords no deference to either party's interpretation of the Phillips Plan. Ms. Sells, in accordance with the terms of the Phillips Plan and as a claimant of benefits, must demonstrate by a preponderance of the evidence that she continues to be totally disabled. Ms. Sells, however, argues that because Metlife, as payor of claims and as claims administrator, has an inherent conflict of interest its decision must be subjected to higher scrutiny under the *de novo* standard, thereby shifting the burden to Metlife.

Ms. Sells appears to misapply the standard. First, a conflict of interest changes the analysis only in cases in which the benefit plan gives discretion to the administrator or, in other words, in arbitrary and capricious review cases. See Fought v. UNUM Life Ins. Co., 379 F.3d 997, 1003 n.2 (10th Cir. 2004). In this case there is no need for the court to "decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict," id., because the Court applies a *de novo* standard and accords no deference to either party's interpretation of the plan. Second, evidence of a conflict of interest requires proof that than plan administrator's dual role jeopardized its impartiality. See id. at 1005. Ms. Sells concedes that there is no evidence that Metlife, in its dual capacity, violated its duty to act fairly.

The Court has before it cross motions for a decision based upon the administrative record. Both sides agree that the administrative record shall be the sole source of evidence before the Court. On February 8, 2006, the Court held a hearing on this matter and counsel for both sides

7

presented arguments. Based upon the administrative record and the arguments of counsel, the

Court makes the following Findings of Fact and Conclusions of Law.

## III. FINDINGS OF FACT

1. On May 26, 1981, Ms. Sells began working for Phillips and became insured under the

Phillips Plan.

2. On June 3, 1986, Ms. Sells was involved in a motor vehicle accident. In the accident,

Ms. Sells sustained a soft tissue whiplash injury. Soon thereafter she began to experience severe

and increasing symptoms, which included: sore muscles; stiffness in her chest muscles, which

restricted her breathing; numbness in her hands, face, and mouth; pins and needles sensations in

her shoulders, arms, and legs; dizziness; cranial pressure; headaches, including migraines with

nausea and vomiting; heart palpitations; sleep difficulties; memory loss; concentration

difficulties; chronic fatigue; and neurocognitive difficulties, including forgetting or transposing

words when speaking.

3. In October 1986, Dr. Yenchick diagnosed Ms. Sells with chronic pain and fibrositis

syndrome. Dr. Yenchick noted that Ms. Sells suffered pain in her head, neck, and arms, and felt

numbness in her arms and legs.

4. In November, 1986, Dr. Yenchick referred Ms. Sells to Dr. Stuart Goodman for a

neurosurgical evaluation.

5. Dr. Goodman noted that Ms. Sells complained of dizziness, numbness in her mouth,

and pressure and pain in her head. She felt pins down her neck, shoulders, arms, and legs. She

also felt increased pain when she bent over. Dr. Goodman found some trigger point tenderness,

but he did "not see any neurological findings that would indicate a severe neurological problem."

8

6. On January 30, 1987, Dr. Nathan Currier completed an Attending Physician's Statement of Disability for General American and diagnosed Ms. Sells with "[f]lexion, extension injury, neck." He noted Ms. Sells' chronic neck pain and concluded that Ms. Sells "could return to work if she could avoid prolonged sitting in one position, avoid long periods of typing, and avoid lifting anything over 10 [pounds]."

7. On March 2, 1987, Ms. Sells applied for long-term disability benefits from General American, the insurer and claim administrator of the Phillips Plan. And in July 1987, General American, "after carefully reviewing all information" submitted to and obtained by it, approved Ms. Sells' claim for long-term disability benefits under the Phillips Plan.

8. Ms. Sells' disability benefits had an effective date of April 15, 1987.

9. Since 1986, multiple doctors have confirmed Ms. Sells' totally disability and her diagnosis of myofacial pain syndrome and fibromyalgia. Those medical determinations are credible. Ms. Sells' doctors have continued to submit to Phillips and its insurer objective evidence of Ms. Sells' symptoms along with her subjective claims.

10. Ms. Sells' doctors have also continued to treat her for her varied symptoms, including: nausea, headaches, pain, fatigue, anxiety, irritable bowels, cognitive difficulties, and breathing and sleep problems. For example, Dr. Robinson, Ms. Sells' treating physician since 1996 and a specialist in fibromyalgia and internal medicine, wrote in her February 24, 2000, progress notes that Ms. Sells headaches were "worse and more frequent." She also wrote that Ms. Sells was suffering from back spasms, insomnia, nausea, increased nervousness, daily cluster migraines, breathing difficulties, and disorientation upon awakening.

9

11. Ms. Sells continued to receive long-term disability payments under the Phillips Plan from April 1987 until May 14, 2001, when Phillips' new insurer and claims administrator, Metlife, decided to withdraw her benefits.

12. Effective August 1, 2000, the administration of the Phillips Plan was transferred from General American to Metlife.

13. On August 4, 2000, Metlife's claim manager reviewed Ms. Sells' file and determined that Metlife needed to reassess whether Ms. Sells continued to be totally disabled.

14. On August 4, 2000, Metlife notified Ms. Sells by letter that it needed to update her claim file and asked her to have her treating physician complete and return an Attending Physician's Statement by August 31, 2000.

15. In evaluating the evidence in the administrative record, the Court has before it the following assessments of Ms. Sells' condition, used by Metlife to determine whether Ms. Sells continues to be totally disabled.

16. In August 2000, Ms. Sells submitted to Metlife information documenting her disability. The Court finds that this information was essentially the same information that she had previously been sending to General American. Ms. Sells' August 2000 submission, however, was now aided by a 15 year documented history of fibromyalgia and the statement of Ms. Sell's long-time doctor, Dr. Robinson, that she had not advised Ms. Sells to return work because Ms. Sells cannot understand verbal or written instructions consistently, and cannot sit or be in one position for over 15 minutes.

17. On August 12, 2000, Dr. Robinson completed an Attending Physician's Statement for Metlife regarding Ms. Sells. Dr. Robinson confirmed that Ms. Sells has been diagnosed with fibromyalgia and myofascial pain.

10

18. Dr. Robinson noted that Ms. Sells' subjective symptoms are headache, shortness of breath, exhaustion, visual blurring, frequent nausea, trouble reading and understanding what people say, frequent "knots" in her neck, lack of coordination, bowel problems, and dizziness.

19. Dr. Robinson's objective findings included multiple trigger points in Ms. Sells' back and neck, and mild airway obstruction.

20. When addressing Ms. Sells' psychological functions, Dr. Robinson noted that stress increases Ms. Sells' asthma and pain, and decreases her neurocognitive function.

21. Dr. Robinson also observed that Ms. Sells' interpersonal skills and ability to perform the duties of her job would be affected by stress because it "precipitates spasm and muscle pain."

22. The Court finds Dr. Robinson's Attending Physician's Statement to be credible.

23. From December 18-20, 2000, International Claim Specialists surveiled Ms. Sells for Metlife. On the first two days of surveillance, Ms. Sells was merely observed operating a motor vehicle. On the third day, Ms. Sells was not observed at all.

24. The Court finds that the surveillance of Ms. Sells yielded no evidence that refutes her claim that her symptoms preclude her from full-time work.

25. Metlife referred Ms. Sells' file to Crawford Healthcare Management Services and hired that company to assess the level of Ms. Sells' "functioning abilities and capabilities as well as her ability to understand instructions."

26. On January 8, 2001, Crawford Healthcare sent a non-physician employee, Mr. Byron Hall, to meet with Ms. Sells in her home to perform a vocational evaluation.

27. Ms. Sells told Mr. Hall that she is in continual pain, feels nausea in the mornings, avoids bending or stooping, limits her lifting of objects to five pounds, has difficulty climbing

11

stairs, has difficulty reading, has trouble balancing, can rarely go shopping, sometimes has difficulty speaking, and leaves most of the housework and yard work to her husband and son.

28. Ms. Sells informed Mr. Hall she did not believe she is able to return to work

29. The Court finds the subjective complaints that Ms. Sells gave to Mr. Hall to be credible.

30. After meeting with Ms. Sells for only two hours, Mr. Hall identified ten vocational alternatives that he believed were available to her based on her education, work experience, and limitations. And Mr. Hall noted that should Ms. Sells apply for a job related to her skills she would find a fair to good labor market.

31. Mr. Hall found that Ms. Sells was able to concentrate and answer questions appropriately, and she apparently had no difficulty walking, using her hands, or talking. Ms. Sells to did not appear to Mr. Hall to be tired or exhausted.

32. Mr. Hall did, however, note that Ms. Sells appeared to have some memory difficulties, and on one or two occasions Ms. Sells mixed up her words and had difficulty speaking. Mr. Hall reported that it was difficult to keep Ms. Sells on track during his questioning. Mr. Hall also observed that Ms. Sells sat for 10 to 15 minutes but then would stand and walk around.

33. The Court finds that the two hour visit by Mr Hall, a non-physician, was insufficient to allow Metlife to make any material determination regarding Ms. Sells' level of disability.

34. In February 2001, a Metlife nurse consultant prepared a summary of Ms. Sells' medical records and the findings of Mr. Hall's home visit. The nurse consultant determined that Ms. Sells' level of impairment needed clarification and referred Ms. Sells' file to Dr. Amy Hopkins, an independent physician consultant, for her review.

12

35. On March 16, 2001, Dr. Hopkins, who is board certified in internal and occupational medicine, determined that there was no objective documentation that Ms. Sells had any physical impairments.

36. Rather than conduct a face to face evaluation of Ms. Sells, however, Dr. Hopkins based her conclusions solely on a review of Ms. Sells' file.

37. Dr. Hopkins observed that Ms. Sells' file contained no documentation of myofascial pain therapy, cognitive behavior therapy, a psychological evaluation, a sleep evaluation, or neuropsychological testing.

38. Dr. Hopkins stated that some of Ms. Sells' symptoms, such as nausea, may be side effects from her medication.

39. Dr. Hopkins concluded that Ms. Sells should be able to return to work full time without any restrictions and limitations and that Dr. Robinson's statement that Ms. Sells is totally disabled was based upon Ms. Sells' subjective complaints alone.

40. The Court finds that Dr. Hopkins incorrectly concluded that Dr. Robinson's assessment of Ms. Sells was based solely on Ms. Sells' subjective complaints.

41. In March 2001, Metlife's nurse consultant summarized Dr. Hopkins' findings and concurred with Dr. Hopkins' conclusion that Ms. Sells was not totally disabled. The nurse consultant then forwarded Dr. Hopkins' report to Dr. Robinson.

42. On April 10, 2001, Dr. Robinson responded, disagreeing with Dr. Hopkins' evaluation. In a lengthy summary of Ms. Sells' medical history and her "longstanding diagnosis of myofascial pain syndrome and fibromyalgia," Dr. Robinson stated that "[a]s much as I would like to see [Ms. Sells] return to work, my suspicion is that this attempt would be unsuccessful."

43. Based upon the following statements by Dr. Robinson, the Court finds her "suspicion" that Ms. Sells would be unable to return to work to be credible.

44. Dr. Robinson noted that severe pain in Ms. Sells' back, neck, and legs precludes her from working in a sedentary position.

45. Dr. Robinson explained that "[i]t is interesting that the home visit," conducted by Mr. Hall on behalf of Metlife, noted "that Ms. Sells could not stay seated for more than 15 minutes. This is because of the severe pain in her back, neck, and legs, which causes her increasing discomfort and even paresthesias, with numbness and tingling in the extremities should she remain in one position for very long."

46. Dr. Robinson wrote that the issue that needs to be addressed is Ms. Sells' constant pain, "which has been documented, and the significance that this would have in her ability to hold down part-time and full-time employment to the satisfaction of an employer."

47. She noted that it is "very difficult to treat pain in fibromyalgia." She stated that it is a difficult condition to treat because there are few medications that are useful for managing chronic pain.

48. Dr. Robinson prescribed daily doses of long-acting Oxycontin to Ms. Sells, "with the hope that [the] continual presence of pain relievers will make her more functional."

49. Dr. Robinson stated that "I am always impressed with the effort that Ms. Sells makes to proactively treat her pain, and in trying to improve her ability to function."

50. Dr. Robinson wrote that aggravating factors for Ms. Sells' condition would include: computer use, typing, stress, heavy lifting, bending, repeated upper extremity moving or lifting, unsupported arm postures, desk work, filing, environmental conditions, cold, and prolonged

driving, telephone use, sitting, standing, and writing.  Dr. Robinson also included as aggravating factors "other activities, such as cleaning."

51.  Dr. Robinson stated that secondary to Ms. Sells' prolonged pain, "it is also documented that [Ms. Sells] has difficulty with exhaustion, visual blurring, inability to read at times, trouble focusing, etc."

52.  Dr. Robinson wrote that "it is unlikely that [Ms. Sells] can return to a productive full-time position, and her part-time positions need to be carefully evaluated for her to maintain an employer acceptable work productivity."

53.  In her letter to Metlife, Dr. Robinson also referenced Ms. Sells' ongoing physical therapy, of which Metlife had been unaware.

54.  Metlife obtained materials from Ms. Sells' physical therapist, Steve Shupe, a specialist in treating myofascial pain and fibromyalgia.  In the diary review report for Ms. Sells' file it states that on May 2, 2001, Metlife's nurse consultant received documents from Mr. Shupe, stating that "[t]hough therapy seems to help at each session, [Ms. Sells] continues to [complain of] discomfort . . . . At one point in the last month or so, [Ms. Sells] felt her pain was the worse [sic] it has ever been and she has been [out of work] since 1986 with this problem."

55.  Metlife asked Dr. Hopkins to review the materials from Mr. Shupe along with Dr. Robinson's reply to Dr. Hopkins' original evaluation of Ms. Sells' file.

56.  On May 3, 2001, Dr. Hopkins stated that the physical therapist's notes "documented some myofacial dysfunction, but no specific impairments were listed."

57.  She also noted that Dr. Robinson's response "reiterated Sells' subjective complaints, but did not document any objective findings."

15

58. Dr. Hopkins disagreed with Dr. Robinson's interpretation of the findings made by Mr. Hall after his home visit with Ms. Sells. Dr. Hopkins wrote that "the home visit actually objectively documented the absence of the factors listed" in Ms. Sells' complaints.

59. Dr. Hopkins concluded that "[n]o physical impairments were documented" in Ms. Sells' file which would preclude her from full-time work in any occupation.

60. On May 14, 2001, Metflife informed Ms. Sells of its decision to terminate her benefits. Among its reasons for terminating Ms. Sells' benefits, Metlife stated that "there is no neuropsychological testing to document complaints of cognitive impairment and no sleep history to document complaints of extreme fatigue."

61. Metlife concluded that "there is no medical documentation or clinical data presented which shows [Ms. Sells'] condition to be severe enough that it would prevent [her] from performing returning [sic] to work on a full time basis."

62. Metlife notified Ms. Sells that she had the right to "file a written request for a review of [her] claim within 60 days of receipt of this letter."

63. On June 6, 2001, Ms. Sells notified Metlife by letter that she was appealing the termination of her benefits.

64. Based upon the following evaluations of Ms. Sells' condition, the Court finds that Metlife's assessment of Ms. Sells' ability was incorrect.

65. On June 6 2001, Steve Shupe wrote a letter on Ms. Sells' behalf, explaining his treatment of her.

66. Mr. Shupe wrote that his evaluation of Ms. Sells showed sacral asymmetry and strong indications for sacroiliac dysfunction.

16

67. Mr. Shupe indicated that range of motion testing showed "restrictions which were significant in the lumbar and cervical spine."

68. He also wrote that "[c]lassic trigger points related to [fibromyalgia] were also present."

69. Mr. Shupe stated that Ms. Sells "also has a strong history and objective confirmation for headaches both of a muscle tension and migraine origin."

70. Mr. Shupe also observed that Ms. Sells has, "from all appearances, been compliant and clearly motivated to resolve her condition to the best of her ability."

71. Although Mr. Shupe wrote that clinically Ms. Sells has periods of improved symptomatology and, "at present," is improved, the complexity of Ms. Sells' case "cannot be underscored."

72. He concluded that "given the complexity and long-standing nature" of Ms. Sells' condition, "it would appear that a short-term solution is not readily available. Although other intervention treatment may be appropriate in the near future, I suspect that treatment to successfully remedy her problem will be months in duration."

73. The Court finds Mr. Shupe's conclusions to be credible.

74. As part of her appeal, Ms. Sells also submitted to Metlife a neuropsychological report and a report regarding her sleep disorder.

75. The sleep report, written by Dr. Tom Cloward, concluded that Ms. Sells has "very serious sleep disordered breathing," with a respiratory disturbance associated with hypoxemia.

76. Based upon Dr. Cloward's report, the Court finds that Ms. Sells has sleep disorders that contribute, in part, to her overall disability.

17

77. The primary cause of Ms. Sells' sleep disorder, according to Dr. Cloward, is related to her use of pain medications, more specifically, "narcotic, benzodiazepine, and muscle relaxant medications."

78. Dr. Cloward recommended that Ms. Sells "[r]educe the amount of the above medications to lowest feasible dose."

79. Dr. Cloward explained that "[i]n a patient with sleep apnea, these medications tend to promote loss of respiratory control and can contribute to severe hypoxemia as seen here."

80. He concluded that Ms. Sells' "underlying borderline asthma would not be enough to account for this degree of hypoxemia."

81. In his report, Dr. Cloward also noted that Ms. Sells' husband was "a little bit frustrated with her because of her lack of energy and fatigue. He [said] that she stays in bed up to 20 hours per day."

82. Ms. Sells' neuropsychological evaluation, conducted by Dr. Janiece Pompa, indicated that Ms. Sells has "high average overall intellectual ability," superior visual organization, and verbal reasoning scores within the high average range, but she "displays marked deficits in speed of information processing, and mild problems in executing functioning and complex problem solving."

83. Based upon Dr. Pompa's report, the Court finds that Ms. Sells has some cognitive impairments, which contribute, in part, to her overall disability.

84. Ms. Sells' visual-motor speed fell within the low average range. And she "displayed relative weaknesses on tasks measuring working memory in remembering numbers forwards and backwards and in arranging in order numbers and letters presented auditorily." Her "working memory is a relative weakness for her, compared to her other scores."

18

85. According to Dr. Pompa, Ms. Sells' pattern of cognitive strengths and weakness is common in patients suffering from fibromyalgia.

86. Dr. Pompa also explained that Ms. Sells' "history of hypoxemia, as well as the cognitive effects of the medication she is taking, may also be factors in her resulting cognitive profile."

87. During her evaluation of Ms. Sells, Dr. Pompa observed that Ms. Sells periodically stood up or changed positions to alleviate her pain. She also took medication during the sessions.

88. Ms. Sells informed Dr. Pompa that "recently she has been going through 'horrific pain,'" and Dr. Pompa noted that although Dr. Robinson has prescribed different kinds of pain medication to Ms. Sells, they have not been very effective. Oxycontin, she noted, however, has helped.

89. Dr. Pompa concluded that from a vocational standpoint, Ms. Sells is intelligent and has adequate capability to sustain competitive employment. Given Ms. Sells' cognitive weaknesses, however, Dr. Pompa opined that Ms. Sells "would probably need to work in a setting where she is not required to work quickly, and does not need to make independent decisions or use higher-order reasoning skills." Dr. Pompa added that "[o]f course" Ms. Sells' "capacity for competitive employment would be mitigated by her chronic pain and physical problems, as documented by her physician."

90. Metlife submitted Ms. Sells' file to a new independent physician consultant, Dr. Joseph Nesta, for his review. Overall, Dr. Nesta agreed with Dr. Hopkins' assessment that Ms. Sells is not totally disabled.

91. Specifically, Dr. Nesta concluded that the records did "not provide strict criteria to make a diagnosis of fibromyalgia by a pure rheumatologic criteria," but the various tests of Ms. Sells, including the documentation of multiple trigger point pain, chronic pain, and sleep disorders, "would support a clinical diagnosis of fibromyalgia."

92. He also concluded that Ms. Sells' pulmonary function tests do suggest that Ms. Sells has mild airway disease.

93. Dr. Nesta commented that sleep disturbances are very commonly seen in patients with fibromyalgia, but when treated they should not prevent the patient from doing work. And according to Dr. Nesta, Ms. Sells appeared to respond to treatment for her sleep apnea.

94. Finally, Dr. Nesta, as a non-neuropsychologist, determined that Ms. Sells' neuropsychological test did not provide adequate documentation that Ms. Sells is precluded in "her ability to work in terms of a total disability from any occupation or from performing a light duty or sedentary position."

95. Although none of Metlife's doctors ever met with or examined Ms. Sells, Metlife nonetheless decided to uphold its termination of Ms. Sells' benefits.

96. In March 2002, Metlife informed Ms. Sells of its decision. Metlife acknowledged that it was not disputing "the existence of a diagnosis or that [Ms. Sells] may experience pain or discomfort with [her] condition."

97. Metlife, however, stated that "clinical evidence must be furnished to substantiate symptoms consistent with those reported by the patient and medical providers."

98. Metlife also informed Ms. Sells that its decision was final and constituted a completion of its review.

99. In January 2003, Claims Management requested that Ms. Sells' file be reopened, but Metlife responded that Ms. Sells' case remained closed.

100. Ms. Sells, now age 55, claims that she continues to be totally disabled and cannot engage in any gainful occupation because she suffers from fibromyalgia, asthma, sleep apnea, acid reflux, migraine and tension headaches, irritable bowel syndrome, memory loss, concentration difficulties, and dysfunction of the sacroiliac, lumber, and cervical regions of her spine.

101. She asserts that among her many problems, she cannot sit for longer than 10 to 15 minutes, concentrate, read, understand instructions, or remember tasks. She claims that in order to work she would need to frequently rest and sleep, sometimes up to 20 hours per day.

102. The evidence, including Ms. Sells' subjective complaints and the objective findings of her treating physicians, shows that Ms. Sells continues to suffer intense pain and severe fatigue as a result of her illness. See Hawkins v. First Union Corp. Long-term Disability Plan, 326 F.3d 914, 919 (7 th Cir. 2003) (stating that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . . but the amount of pain and fatigue that a particular case of it produces cannot be").

103. Weighing the evidence before it, including the opinions of multiple doctors who have examined Ms. Sells and her file over the last seventeen years, the Court finds that the scales tip in favor of Ms. Sells' claim that she has met her burden of proof in demonstrating by a preponderance of the evidence that she continues to be totally disabled.

104. The Court finds that Metlife's conclusion to the contrary is not supported by the evidence in the administrative record.

105. The Court finds that Ms. Sells' disability precludes her from working at any gainful employment.

## IV. CONCLUSIONS OF LAW

1. Pursuant to the terms of the Phillips Plan, Ms. Sells has the contractual burden of demonstrating by a preponderance of the evidence that she remains totally disabled for purposes of long-term disability benefits.

2. The Court rejects Ms. Sells' assertion that the burden of proof is shifted to Metlife because of any alleged conflict of interest.

3. The Court determines as a matter of law that Ms. Sells has met her burden of demonstrating that she continues to be totally disabled, making her eligible for continued long-term disability benefits under the Phillips Plan.

4. Ms. Sells is also entitled to disability payments dating from the time Metlife terminated her benefits until the present.

IT IS SO ORDERED.

DATED this 22nd day of February, 2006.

Dee Benson
United States District Judge

22